NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210150-U

NO. 4-21-0150

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 9, 2022
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* MARRIAGE OF ROBERT D. BROWN, | ) | Appeal from the |
|     Petitioner-Appellee and Cross-Appellant, | ) | Circuit Court of |
|     and | ) | McLean County |
| AMANDA V. BROWN, | ) | No. 17D504 |
|     Respondent-Appellant and Cross-Appellee. | ) | |
| | ) | Honorable |
| | ) | Amy L. McFarland, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Presiding Justice Knecht and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court did not err in (1) denying respondent's motion to disqualify counsel, (2) denying petitioner's motion *in limine* to bar respondent's valuation expert, (3) determining the valuation of the marital business, and (4) denying respondent maintenance.

¶ 2    In November 2017, petitioner, Robert D. Brown, filed a petition for the dissolution of his marriage to respondent, Amanda V. Brown. Respondent filed a counterpetition for the dissolution of the parties' marriage. In October 2018, respondent filed a motion to disqualify petitioner's counsel, Michelle Mosby-Scott and her law firm, the day after Mosby-Scott had entered her appearance as petitioner's attorney. On November 30, 2018, the McLean County circuit court held a hearing on respondent's motion to disqualify. At the conclusion of respondent's evidence, petitioner moved for a finding in his favor, which the court granted. During the evidentiary hearing on remaining issues, petitioner raised an objection to the

testimony of respondent's business valuation expert. A discovery violation was found, and the circuit court's remedy was to grant respondent 14 days to comply with discovery and petitioner time to respond to any disclosed discovery. Respondent filed a certificate of compliance, and petitioner filed a motion *in limine* seeking to bar the testimony and report of respondent's expert. The court denied petitioner's motion *in limine* and later resumed the evidentiary hearing. In January 2021, the court entered an order on all remaining issues and later filed a judgment of dissolution of marriage incorporating the order on all remaining issues.

¶ 3    Respondent appeals, contending the circuit court erred by (1) denying her motion to disqualify petitioner's counsel, (2) accepting petitioner's expert's valuation of the marital business, and (3) failing to award respondent maintenance. Petitioner cross-appeals, arguing the court erred by denying his motion *in limine* and allowing respondent to present expert testimony and a written report. We affirm.

¶ 4                                I. BACKGROUND

¶ 5    The parties were married in August 2008 and had two children, E.B. (born in February 2011) and A.B. (born in April 2014). On November 30, 2017, petitioner, by his attorneys, G. Edward Murphy and Murphy & Dunn, P.C., filed a petition for the dissolution of the parties' marriage. On December 6, 2017, respondent filed a counterpetition for dissolution of marriage by her attorney, Stephanie Scoles, in which respondent sought, *inter alia*, maintenance. On October 22, 2018, Michael Fenger, who worked on petitioner's case while employed by Murphy & Dunn, P.C., became an attorney at Allison & Mosby-Scott.

¶ 6    On October 29, 2018, petitioner filed a motion for substitution of attorney, requesting to have Mosby-Scott represent him. That same day, the circuit court granted petitioner's motion for substitution of his attorney. The next day, respondent filed a motion to

disqualify Mosby-Scott. Respondent alleged she had a paid consultation with Angela Skinner, an associate attorney under Mosby-Scott, on November 12, 2017, regarding issues substantially related to those at issue in this case. Respondent claimed she was a former client of Mosby-Scott's firm. She also asserted she did not give informed consent for the waiver of a direct conflict and adequate information did not exist to show proper screening in Mosby-Scott's firm. Petitioner filed a response to respondent's motion, asserting, *inter alia*, respondent was a prospective client, proper screening was in place, and no imputed conflict existed under the Illinois Rules of Professional Conduct. Petitioner attached to his response his own affidavit and those of the following: (1) Fenger; (2) Timothy A. Eckhardt, an attorney in Mosby-Scott's firm; (3) Michael Scott, an attorney in Mosby-Scott's firm; (4) Matthew R. Majernik, an attorney in Mosby-Scott's firm; (5) Skinner; (6) Mosby-Scott; and (7) Derek J. Luster, an attorney in Mosby-Scott's firm.

¶ 7 On November 30, 2018, the circuit court held a hearing on respondent's motion to disqualify petitioner's counsel. The docket entry for the hearing states respondent testified on her own behalf and presented petitioner's testimony. After the evidence, petitioner moved for a finding in his favor, which the court granted. A verbatim transcript of the hearing is not included in the record on appeal. A bystander's report is included, but it only states the parties' arguments at the hearing and the circuit court's resolution of the motion.

¶ 8 In October 2019, the circuit court entered a case management conference order, stating written discovery was to be completed by November 8, 2019. On November 1, 2019, the court entered a final pretrial order, stating a November 29, 2019, deadline for written discovery and setting the following dates: (1) January 6, 2020, for a final pretrial conference; (2) January 10, 2020, for objections to trial exhibits; and (3) January 15 and 16, 2020, for the final hearing.

The final pretrial order also included a final pretrial checklist, which required the parties to provide the opposing counsel with courtesy copies of all proposed trial exhibits at the final pretrial conference. A certificate of compliance with final pretrial requirements was entered on January 6, 2020.

¶ 9    On January 15, 2020, the circuit court commenced the hearing on the remaining contested issues and identified some of the issues the parties' agreed upon. The court noted both parties agreed the Ameritrade accounts for the minor children were nonmarital property. Petitioner testified on his own behalf and presented the testimony of Dennis Knobloch, a business valuation expert, and Jason Stephens, the parties' accountant.

¶ 10    Petitioner testified he was a 49-year-old chiropractor and the owner of Elite Chiropractic and Rehab, which he started in October 2011. He obtained his chiropractic degree in 2000 and still had $352,560 in outstanding student loans, which he acknowledged were nonmarital. He had not made any student loan payments during the previous 12 months. Petitioner further testified the business records for Elite Chiropractic and Rehab contain a $60,000 shareholder loan. That "loan" was merely a journal entry to show the amount of shareholder distributions petitioner took which exceeded the business's profit. Moreover, petitioner testified, during the divorce proceedings, petitioner had been unable to meet his monthly expenses and pay his debts. He sold the marital boat and used the $3300 in profits to pay a state income tax debt and the remainder of the minor children's school tuition balance. Petitioner also testified he did not have the ability to pay respondent $917.58 in monthly maintenance. Additionally, petitioner testified, he sold a prior business named Brown Chiropractic for $50,000 in 2009.

¶ 11    The circuit court accepted Knobloch, an accountant, as an expert on the valuation

of the business. Petitioner hired Knobloch to complete a valuation of Elite Chiropractic and Rehab. Knobloch valued the business at $16,000. Knobloch testified he found the business's equipment had a value of $36,000. His report contained a list of all the business's assets and their respective values. Knobloch explained he started with the original costs of the assets from the depreciation schedule used to prepare tax returns and "estimated economic life of the assets and took depreciation to get down to the remaining useful life to come with *** an estimated value of these assets." Knobloch believed the aforementioned methodology was the best practice for small businesses. He further testified some of the assets were no longer in existence. Knobloch noted respondent's inventory of marital assets valued the business equipment at $116,432. He believed respondent took the total cost of the property listed on the 2018 depreciation schedule and subtracted the value of the truck that petitioner no longer owned to get the $116,432 figure. Knobloch testified respondent's valuation of the equipment was $4000 more than its original cost and he had never seen office and medical equipment appreciate in value. Knobloch further testified the depreciation schedule included items that were no longer in service. In his valuation of the business, Knobloch did not include the $60,000 shareholder loan made in 2014 because, if he included it, then petitioner's personal inventory would have a $60,000 liability. Knobloch chose an asset-based approach for valuation because petitioner was a sole practitioner and any goodwill in the business would be attributable to petitioner and not the business. He also testified, in the event of a sale of the business, a noncompete clause would affect the business's valuation and respondent's expert failed to consider the necessity of a noncompete clause. Additionally, Knobloch testified the calculation of petitioner's monthly gross income of $6259 was accurate. For the period of 2014 to 2018, petitioner had an average yearly salary of $18,362 and average yearly shareholder distributions of $49,527.

¶ 12        Stephens testified he was an accountant.  He had completed the parties' income tax returns in the past and had done petitioner's 2018 individual income tax return in 2018. Stephen also explained the shareholder loan.

¶ 13        Respondent began her case with the testimony from Bryan Callahan, her expert on the valuation of the marital business.  Petitioner's counsel objected to Callahan's testimony under Illinois Supreme Court Rule 213(f) (eff. Jan. 1, 2018) because no opinions by Callahan were disclosed.  The circuit court agreed with petitioner respondent failed to comply with the rule but found the appropriate remedy was to give respondent 14 days to disclose his witness's opinions and the bases for the opinions.  On January 30, 2020, respondent's counsel filed an affidavit of compliance, stating counsel had complied with the court's January 16 ruling by providing Callahan's curriculum vitae, expert report, discretionary compensation schedule, and the shareholder distribution account history of the marital business.

¶ 14        In February 2020, petitioner filed a motion *in limine*, seeking to bar Callahan's report.  In response, respondent filed a motion to supplement the trial exhibits with exhibits related to Callahan's testimony and asserted she would be prejudiced if Callahan's report was barred.  Petitioner filed a response, arguing the motion to supplement should be denied.

¶ 15        On May 4, 2020, the circuit court heard arguments on petitioner's motion *in limine* and respondent's motion to supplement trial exhibits.  A bystander's report of the hearing was included in the record on appeal.  After hearing the parties' arguments, the court took the matter under advisement.  On June 15, 2020, the court entered a written order, finding the remedy fashioned by the court in its January 16, 2020, order and the timing of the case (continuance due to COVID-19) allowed petitioner adequate time to prepare.  The court allowed respondent's motion to supplement trial exhibits and denied petitioner's motion *in limine*.

¶ 16    On July 7, 2020, the circuit court resumed the evidentiary hearing, and the hearing began with Callahan's testimony. After Callahan's testimony, respondent resumed her cross-examination of petitioner. The fourth day of the hearing took place on July 8, 2020. Petitioner finished his testimony, respondent testified on her own behalf, and petitioner presented rebuttal testimony from Knobloch.

¶ 17    Callahan testified he was asked to value the marital business and to look for dissipation of marital assets. He based his valuation on the examination of financial documents dated through April 30, 2019. Callahan explained the Statement of Standards for Valuation Services provided for three methods of valuation: the market approach, the income approach, and the asset approach. The standards required valuation experts to consider all three and then utilize the one or more methods the expert found appropriate. In Callahan's opinion, Knobloch did not do any of the three. Callahan testified Knobloch just did a calculation without the use of professional judgment. He stated Knobloch did not determine the fair market value of the assets. Callahan also noted Knobloch did not include goodwill in his valuation.

¶ 18    In his valuation, Callahan determined the application of the asset approach did not make any sense for a service provider. Callahan determined the valuation of the marital business based on both the income approach and the market approach. He then blended the two values by giving 75% weight to the income approach and 25% weight to the market approach. With the income approach, Callahan utilized the capitalized cash flow method. That method looks at historical cash flows and historical income to determine the expected cash flows now, and then uses a capitalization rate that is divided into the number of the economic benefit that was determined based off that historical perspective. As a component of that method, Callahan distinguished between personal and enterprise goodwill in determining capitalization rate.

Callahan allowed for a 10% discount "to account for the fact that [petitioner] is driving a good portion of what the business is doing." That discount lowered the business's value by $80,000. Callahan testified the business had enterprise goodwill because another chiropractor could step right in and keep the business going. Callahan ended up with a 23% capitalization rate, which produced a value of $219,383 for invested capital. That rate was reduced by debt and then petitioner's truck was added back into the calculation to yield a fair market value of $208,444.

¶ 19          As to the market approach, Callahan used the prior transactions method, which uses databases of private transactions and all the metrics that go along with those transactions. Callahan then found some transactions analogous to Elite Chiropractic. Callahan explained the market approach he used did consider the fact a sale may or may not have a noncompete agreement. He could not see a situation where a transaction would occur without a noncompete agreement. Callahan found 32 private transactions related to chiropractic services and narrowed them down to 15 transactions that were comparable to Elite Chiropractic to use in his valuation. All but a few of the transactions had noncompete agreements. He applied the same factors for Elite Chiropractic, such as revenue and discretionary earnings, and then weighed the factors to come to a market driven value based off the transactions that were available, which he determined to be $145,000. Callahan noted he gave a 10% discount due to marketability. Callahan noted the standards do not require his valuation opinion include a statement petitioner would need a noncompete agreement to sell the business. In the end, Callahan determined the value of the marital business was $173,000. Callahan had not valued another business in the Bloomington-Normal area before. The 2014 shareholder loan had no impact on his valuation of the business.

¶ 20          Respondent testified she was 40 years old and had a bachelor's degree in family

and consumer science and a master's degree in communications. She currently worked as a human resources representative at Illinois State University and had a part-time job at Evolve Fitness. She received a yearly raise, which varied and was around 0.2%. After the beginning of the COVID-19 pandemic, she had not worked very much at Evolve Fitness. When petitioner sold Brown Chiropractic in 2009 to move to Kentucky to work for Dynamic Chiropractic, respondent was working at State Farm Bank in collections. She quit her job, and the family moved to Kentucky. There, respondent worked for DeVry University as an admissions counselor. Petitioner was fired from his job at Dynamic Chiropractic, and the parties moved back to the Bloomington-Normal area. Respondent left her job at DeVry University. When they first moved back, respondent assisted petitioner with getting the office ready, marketing, and just trying to generate business. Respondent also worked in the office when petitioner first opened the doors to Elite Chiropractic. After that, she went to work for Illinois State University. Since she was an Illinois State University employee, her tuition and fees for her master's degree were covered. The only costs were for books and an occasional babysitter.

¶ 21        Both parties presented numerous exhibits, including the valuation reports by their experts.

¶ 22        At the conclusion of the evidence, the circuit court took the matter under advisement and granted the parties 14 days to file written closing arguments. The parties did so and included an inventory of assets and liabilities with proposed distributions. On January 25, 2021, the circuit court entered an order on all remaining issues. The court found petitioner's valuation of the marital business was accurate and did not award respondent maintenance. Additionally, in determining the amount of child support, the court accepted respondent's calculation of petitioner's net annual income of $87,396. On February 5, 2021, the court entered

a judgment of dissolution of marriage incorporating the court's order on all remaining issues.

¶ 23    On March 5, 2021, respondent filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). On March 22, 2021, petitioner filed a timely notice of appeal for his cross-appeal. Accordingly, this court has jurisdiction of the appeal and cross-appeal under Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994).

¶ 24    II. ANALYSIS

¶ 25    A. Motion to Disqualify Counsel

¶ 26    Respondent contends the circuit court erred by denying her motion to disqualify petitioner's counsel Mosby-Scott because respondent had previously consulted with a member of Mosby-Scott's firm regarding the parties' dissolution of marriage. Petitioner asserts the circuit court did not err because the attorney respondent consulted was "screened" and did not participate in petitioner's representation. For the reasons set forth below, the record is inadequate to address this issue on appeal.

¶ 27    The Illinois Rules of Professional Conduct of 2010 at issue in this case were Rules 1.9 and 1.18. Rule 1.9 addresses an attorney's duties to former clients. Ill. R. Prof'l Conduct (2010) R. 1.9 (eff. Jan. 1, 2010). Specifically, Rule 1.9(a) prohibits an attorney who has formerly represented a client in a matter from later representing "another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent." Ill. R. Prof'l Conduct (2010) R. 1.9(a) (eff. Jan. 1, 2010). Rule 1.18 addresses an attorney's duties to prospective clients, which the rule defines as "[a] person who consults with a lawyer about the possibility of forming a client-lawyer relationship with respect to a matter." Ill. R. Prof'l Conduct (2010) R.

1.18(a) (eff. Jan. 1, 2016). Under Rule 1.18(b), even when a client-lawyer relationship did not ensue, the lawyer who learned information from the prospective client shall not use or reveal that information, except as allowed by Rule 1.9. Ill. R. Prof'l Conduct (2010) R. 1.18(b) (eff. Jan. 1, 2016). When a lawyer is subject to Rule 1.18(b), the lawyer "shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter, except as provided in paragraph (d)." Ill. R. Prof'l Conduct (2010) R. 1.18(c) (eff. Jan. 1, 2016). If a lawyer is disqualified from representation under Rule 1.18, no lawyer in the attorney's firm may knowingly undertake or continue representation in such a matter, except as provided in paragraph (d). Ill. R. Prof'l Conduct (2010) R. 1.18(c) (eff. Jan. 1, 2016). Rule 1.18(d) provides the following:

"When the lawyer has received disqualifying information as defined in paragraph (c), representation is permissible if:

(1) both the affected client and the prospective client have given informed consent, or

(2) the lawyer who received the information took reasonable measures to avoid exposure to more disqualifying information than was reasonably necessary to determine whether to represent the prospective client; and that lawyer is timely screened from any participation in the matter and is apportioned no part of the fee therefrom." Ill. R. Prof'l Conduct (2010) R. 1.18(d) (eff. Jan. 1, 2016).

¶ 28 Respondent contends she had a former attorney-client relationship with an attorney in Mosby-Scott's firm. With Rule 1.9, the party seeking disqualification first must prove the existence of the former attorney-client relationship. *Gagliardo v. Caffrey*, 344 Ill.

- 11 -

App. 3d 219, 226, 800 N.E.2d 489, 494 (2003). The docket entry for the November 30, 2018, hearing indicates respondent testified on her own behalf at the hearing and called petitioner as a witness. After respondent's evidence, petitioner moved for a finding in his favor, which the circuit court granted. The record on appeal lacks a verbatim transcript for the November 30, 2018, hearing, and the bystander's report does not set forth respondent's and petitioner's testimony. As the appellant, respondent "has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error." *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92, 459 N.E.2d 958, 959 (1984). In the absence of a complete record on appeal, this court will presume "the order entered by the trial court was in conformity with law and had a sufficient factual basis." *Foutch*, 99 Ill. 2d at 392, 459 N.E.2d at 959. In this case, the circuit court granted a finding in favor of petitioner on the motion to disqualify after respondent's evidence, but the record on appeal does not include a transcript, bystander's report, or agreed statement of facts setting forth the *evidence heard* by the circuit court. See Ill. S. Ct. R. 323 (eff. July 1, 2017). Without an adequate report of proceedings for the November 30, 2018, evidentiary hearing, this court has no basis for holding the circuit court abused its discretion in granting a finding in favor of petitioner on respondent's motion to disqualify petitioner's counsel. See *Foutch*, 99 Ill. 2d at 392, 459 N.E.2d at 959.

¶ 29                           B. Respondent's Expert Witness

¶ 30          In his cross-appeal, petitioner asserts the circuit court erred by allowing Callahan to testify and respondent to supplement her trial exhibits with Callahan's report. Respondent disagrees.

¶ 31          Under Illinois Supreme Court Rule 213(f)(3) (eff. Jan. 1, 2018), respondent was required to disclose the following for its witness Callahan: "(i) the subject matter on which the

- 12 -

witness will testify; (ii) the conclusions and opinions of the witness and the bases therefor; (iii) the qualifications of the witness; and (iv) any reports prepared by the witness about the case." Illinois Supreme Court Rule 213(g) provides "[t]he information disclosed in answer to a Rule 213(f) interrogatory, or in a discovery deposition, limits the testimony that can be given by a witness on direct examination at trial." It is undisputed respondent completely failed to comply with the aforementioned rule with regard to Callahan before the November 2019 discovery deadline. Moreover, Illinois Supreme Court Rule 219 (eff. July 1, 2002) addresses the consequences of failing to comply with discovery rules or orders, and the circuit court has broad powers to enforce its discovery orders. *Koppel v. Michael*, 374 Ill. App. 3d 998, 1003, 871 N.E.2d 888, 894 (2007). Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) sets forth some possible sanctions for violations of discovery rules or orders.

¶ 32    When petitioner objected to Callahan's testimony during the hearing on January 16, 2020, the circuit court found respondent had violated Rule 213(f)(3) but concluded the appropriate relief was to grant respondent 14 days to comply with Rule 213(f)(3) and for petitioner to have time thereafter to address respondent's new discovery. On January 30, 2020, respondent filed a certificate of compliance with Rule 213. A few weeks after respondent filed his certificate of compliance, petitioner filed a motion *in limine* to bar Callahan's testimony and report based on respondent's original violation of Rule 213. Petitioner noted Callahan's report was not completed until after the November 2019 discovery deadline. The circuit court denied petitioner's motion *in limine*, finding its remedy to the Rule 213(f)(3) violation was proper. An order under Rule 219 is largely a matter within the circuit court's discretion, and this court will not disturb that order unless it constitutes an abuse of discretion. See *Koppel*, 374 Ill. App. 3d at 1004, 871 N.E.2d at 894. The same standard of review applies to the admission of evidence

- 13 -

under Rule 213. See *Sullivan v. Edward Hospital*, 209 Ill. 2d 100, 109, 806 N.E.2d 645, 651 (2004). A court abuses its discretion when no reasonable person would agree with the position adopted by the court. *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 176, 685 N.E.2d 871, 876 (1997).

¶ 33        Both the language of Rule 213 and the committee comments to the rule indicate the intent of the rule is "to do substantial justice between or among the parties." Ill. S. Ct. R. 213(k) (eff. Jan. 1, 2018); see also Ill. S. Ct. R. 213, Committee Comments (adopted Mar. 28, 2002). The committee comments further state the following:

> "This rule is intended to be a shield to prevent unfair surprise but not a sword to prevent the admission of relevant evidence on the basis of technicalities. The purpose of the rule is to allow for a trial to be decided on the merits. The trial court should take this purpose into account when a violation occurs and it is ordering appropriate relief under Rule 219(c)." Ill. S. Ct. R. 213, Committee Comments (adopted Mar. 28, 2002).

Illinois Supreme Court Rule 219(c) (eff. July 1, 2002) provides when a party fails to comply with a discovery rule or order entered under a rule, the court "may enter, in addition to remedies elsewhere specifically provided, such orders as are just, including, among others," seven enumerated remedies. One of the listed remedies is staying the proceedings until the order or rule is complied with, and another is barring the witness from testifying concerning that issue. Ill. S. Ct. R. 219(c)(i), (iv) (eff. July 1, 2002).

¶ 34        In support of his argument the circuit court abused its discretion by denying his motion *in limine* to bar Callahan's report, petitioner cites *Sullivan*, 209 Ill. 2d at 111, 806 N.E.2d at 653, in which our supreme court found the circuit court did not abuse its discretion striking a portion of an expert's testimony for violating Rule 213. This court in *Enbridge Pipeline*

*(Illinois), LLC v. Hoke*, 2017 IL App (4th) 150544, ¶ 104, 80 N.E.3d 807, which petitioner cites in his reply brief, also addressed whether the circuit court abused its discretion by barring an expert's valuation testimony. In his opening brief, petitioner explains how the facts of this case could be construed to meet the six factors for excluding a witness for a discovery violation set forth in *Sullivan*, 209 Ill. 2d at 111, 806 N.E.2d at 652. First, we note, unlike the cases cited by petitioner, respondent had complied with discovery rules based on the circuit court's January 16, 2020, order extending the discovery date when petitioner filed his motion *in limine* seeking to bar Callahan's testimony and report. Moreover, even if the facts of this case met the six factors for barring Callahan's testimony and report, the circuit court chose a different sanction in this case, and petitioner fails to explain why that sanction was unreasonable, beyond simply contending strict compliance with Rule 213 is mandatory. Here, the circuit court clearly considered the purpose of Rule 213 in imposing its relief under Rule 219(c) and the circumstances of the case and the evidentiary hearing. The need for a continuance of the evidentiary hearing on January 16, 2020, due to insufficient time, provided an opportunity for respondent to comply with the discovery rule and time for petitioner to respond to respondent's discovery without being surprised at the continued evidentiary hearing. Moreover, the circuit court did not find any tactical gamesmanship like this court found in *Enbridge Pipeline (Illinois), LLC*, 2017 IL App (4th) 150544, ¶ 115. The circuit court's remedy allowed for a hearing on the merits of the business valuation with evidence from both parties, and the court's relief avoided any surprise to petitioner at the continued evidentiary hearing. Accordingly, we find the circuit court did not abuse its discretion in denying petitioner's motion *in limine*.

¶ 35                                    C. Business Valuation

¶ 36              In her appeal, respondent also contends the circuit court erred by accepting

petitioner's expert's valuation of the chiropractic business and disregarding her expert's valuation. Specifically, she argues Knobloch's calculation (1) was neither an actual valuation nor a determination of fair market value and (2) failed to account for goodwill. Petitioner contends the circuit court's use of his expert's valuation was proper.

¶ 37     The circuit court bears the responsibility of resolving conflicting testimony concerning the valuation of marital assets. *In re Marriage of Schneider*, 214 Ill. 2d 152, 171, 824 N.E.2d 177, 188 (2005). This court will not reverse a circuit court's value determination unless it is against the manifest weight of the evidence. *In re Marriage of Heroy*, 385 Ill. App. 3d 640, 663, 895 N.E.2d 1025, 1047 (2008). A decision is against the manifest weight of the evidence where the opposite conclusion is clearly evident or the circuit court's findings are unreasonable, arbitrary, and not based on any evidence. *Heroy*, 385 Ill. App. 3d at 663, 895 N.E.2d at 1047.

¶ 38     Respondent contends Knobloch did not provide a fair market value as required by section 503(k) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/503(k) (West 2016)). She contends Knobloch used unadjusted book value. However, Knobloch expressly denied using book value. Knobloch explained he used the original costs of the business's assets and adjusted the value of the assets based on the assets' "economic life" to come up with an estimated value of the business assets. Knobloch then subtracted the business's liabilities from its assets to arrive at a value of $16,000. Knobloch described his approach to valuation as the asset approach method. In *In re Marriage of Cutler*, 334 Ill. App. 3d 731, 736, 738, 778 N.E.2d 762, 767-78 (2002), cited by both parties, the reviewing court accepted the expert's evaluation of fair market value using the asset approach method. Like Knobloch, that expert had determined the value of the insurance agency by subtracting the value of the

business's liabilities from that of the assets to arrive at a value of $32,000. *Cutler*, 334 Ill. App. 3d at 734, 778 N.E.2d at 765. Respondent contends *Cutler* is distinguishable because the market approach valuation in *Cutler* was not supported by a proper foundation, and thus the asset approach was the only method with a foundation. Assuming Callahan's valuation had a proper foundation, reviewing courts have found it acceptable for a circuit court to select a valuation between opposing values in evidence when a record contains conflicting evidence on the valuation. *Cutler*, 334 Ill. App. 3d at 736, 778 N.E.2d at 767. Stated differently, as long as the circuit court's valuation of a marital asset is within the range testified to by expert witnesses, the reviewing court ordinarily will not disturb the valuation on appeal. *Heroy*, 385 Ill. App. 3d at 663, 895 N.E.2d at 1047. The circuit court's valuation of $16,000 was within the range of the parties' experts.

¶ 39 Respondent further argues, even in using the asset approach method, Knobloch did not value the assets correctly. She notes Knobloch included the value of petitioner's truck and the loan related to the truck in the calculation (the largest asset and liability), which means the remaining assets were assigned nominal value indicating Knobloch depreciated the assets away with Internal Revenue Service 179 deductions. However, the testimony respondent cites in support of her argument was referring to child support calculations and not the business valuation determination. Moreover, in his testimony, Knobloch indicated using the value of the assets after depreciation was not proper because most tax regulations allow equipment to be written off in the year that they are purchased but the economic life of the assets is longer than a year. Thus, the evidence does not show Knobloch used values after depreciation in determining the business's value. She also challenges Knobloch's failure to include the $60,000 shareholder loan as an asset of the business. However, as noted, if the loan was an asset to the business, then

- 17 -

it was a marital liability. Moreover, respondent's own expert did not consider the shareholder loan. Additionally, respondent does not challenge the circuit court's finding the aforementioned situation would be detrimental to respondent. Thus, respondent has not shown Knobloch failed to value the business assets properly.

¶ 40 Additionally, for the first time on appeal, respondent points out the parties had sold the same business in the same market in the past and the amount of that sale should have been considered in valuing Elite Chiropractic. Petitioner testified he sold his former business, Brown Chiropractic, in 2009 for $50,000. We note Knobloch's value of $16,000 is significantly closer to $50,000 than Callahan's value of $173,000.

¶ 41 Respondent also contends the circuit court did not take into consideration the business's goodwill in the property allocation or maintenance. We disagree. In *In re Marriage of Zells*, 143 Ill. 2d 251, 256, 572 N.E.2d 944, 946 (1991), our supreme court explained the following regarding professional/personal goodwill:

> "Adequate attention to the relevant factors in the Dissolution Act results in an appropriate consideration of professional goodwill as an aspect of income potential. The goodwill value is then reflected in the maintenance and support awards. Any additional consideration of goodwill value is duplicative and improper."

The supreme court later emphasized the basis for its holding in *Zells* was the fact "personal goodwill 'is already reflected in a number of the circumstances that must be considered by a judge in making an equitable division of property under the [Dissolution] Act.' " *Schneider*, 214 Ill. 2d at 166, 824 N.E.2d at 185 (quoting *In re Marriage of Talty*, 166 Ill. 2d 232, 237, 652 N.E.2d 330, 333 (1995)). Here, the circuit court utilized respondent's income calculations for

petitioner in determining the child support award, which was a more accurate reflection of petitioner's income. Moreover, the court considered petitioner's future earning capacity in its maintenance analysis as it noted petitioner's future earning capacity was "far greater than [r]espondent's."

¶ 42        As to enterprise goodwill, it has been recognized, "on *appropriate proof*, enterprise goodwill may be susceptible of valuation." (Emphasis added.) *In re Marriage of Head*, 273 Ill. App. 3d 404, 410, 652 N.E.2d 1246, 1251 (1995). We agree with the circuit court's finding there was insufficient evidence of the value of enterprise goodwill. Respondent asserts Callahan assigned an appropriate value for enterprise goodwill but does not even identify what that assigned value was. Moreover, the testimony and evidence she cites does not contain an assigned value for enterprise goodwill. At best, Callahan's testimony and report explain how he included enterprise goodwill in calculation of business value but does not contain a specific value for enterprise goodwill itself.

¶ 43        Accordingly, we find respondent has failed to show the circuit court abused its discretion in accepting Knobloch's $16,000 valuation of the marital business.

¶ 44                                D. Maintenance

¶ 45        Last, respondent contends the circuit court erred by failing to award her maintenance. Petitioner asserts the court's decision was proper. The propriety of a maintenance award lies within the circuit court's discretion, and this court will not disturb that decision absent an abuse of discretion. *Schneider*, 214 Ill. 2d at 173, 824 N.E.2d at 189.

¶ 46        Section 504 of the Dissolution Act (750 ILCS 5/504 (West 2016)) governs maintenance awards and sets forth 14 factors the court must consider in deciding whether to award spousal maintenance. Those factors include the following: (1) the income and property of

each party, (2) each party's needs, (3) the realistic present and future earning capacity of each party, (4) any impairment of the party seeking maintenance due to that party devoting time to domestic duties or having foregone or delayed education, training, employment, or career opportunities due to the marriage, (5) any impairment of the realistic present and future earning capacity of the party against whom maintenance is sought, (6) the time necessary to enable the party seeking maintenance to acquire appropriate training, education, and employment, and whether that party is able to support himself or herself through appropriate employment or any parental responsibility arrangements and its effect on the party seeking employment, (7) the standard of living established during the marriage, (8) the marriage's duration, (9) the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities, and needs of the parties, (10) all sources of public and private income, including retirement and disability income, (11) the tax consequences to each party, (12) contributions and services of the party seeking maintenance to the education, training, career or career potential, or license of the other spouse, (13) any valid agreement of the parties, and (14) any other factor that the court expressly finds to be just and equitable. 750 ILCS 5/504(a) (West 2016). No single factor is determinative. *Heroy*, 385 Ill. App. 3d at 651, 895 N.E.2d at 1038. Additionally, the circuit court is not limited to a review of the section 504(a) factors in setting a maintenance award. *Heroy*, 385 Ill. App. 3d at 651, 895 N.E.2d at 1038.

¶ 47    On appeal, respondent addresses most of the aforementioned factors. With the first factor, respondent asserts the circuit court failed to make an equitable distribution of the marital property. However, the only significant discrepancy between respondent's proposed distribution and the circuit court's distribution of marital property was the value of the marital business, which we have already addressed. It is well-settled a party forfeits his or her right to

complain of an error on appeal where to do so would be inconsistent with his or her position in the circuit court. *People v. Toliver*, 2016 IL App (1st) 141064, ¶ 31, 64 N.E.3d 659. The record shows respondent proposed awarding petitioner the entire value of the business in her proposed distribution of marital assets and liabilities. Moreover, respondent's proposed distribution listed the minor children's Ameritrade accounts as nonmarital property and failed to include the profit from the boat sale as a marital asset. Thus, respondent has not shown an error with the circuit court's property distribution, which split the assets and liabilities equally. Additionally, the circuit court recognized the equalization payment to respondent was minimal. We note the distribution of the marital estate left both parties with a debt of $3732.90. As to income, in her closing argument, respondent asserted her gross monthly income from both jobs was $4110, which is close to $50,000 annually. Petitioner's net yearly income was $87,396.00. The circuit court's order on remaining issues indicates the court did consider the parties' postdissolution financial situation. We note the parties' postdissolution financial situation is just one of the many factors the circuit court considered.

¶ 48        Regarding the second factor, respondent contends the circuit court failed to properly consider her needs. However, the court found in its written order the parties' needs were fairly similar. Moreover, before its maintenance analysis, the court recognized the parties could not maintain their marital lifestyle living in separate households. Thus, we disagree the circuit court overlooked respondent's needs.

¶ 49        With the third factor, respondent makes numerous arguments about the limits of her earning capacity. Regardless, the circuit court explicitly found petitioner's earning capacity was far greater than respondent's.

¶ 50        As to factor four, respondent's argument addresses only impairment in general

and does not address impairment due to the devotion of time for domestic duties or having forgone or delayed education, training, employment, or career opportunities due to the marriage. As such, we do not disturb the circuit court's finding on this factor.

¶ 51 Factor five is not an issue. Regarding factor six, respondent again raises numerous arguments about how her current job does not allow her to enjoy the marital standard of living to which she had become accustomed. However, respondent presented no evidence she needed time to acquire more education, training, or employment or that caring for the minor children impacted her ability to work. She also did not claim her employment is insufficient to meet her basic needs but again focuses on the marital standard of living. The standard of living established during the marriage is factor seven, not factor six.

¶ 52 As to factor seven, the circuit court recognized the parties' modest middle-income standard of living. The record contains no evidence the court failed to consider the marital standard of living in making its ultimate determination to not award respondent maintenance. In fact, as previously stated, the court in another part of the order recognized the parties could not maintain their marital standard of living as separate households.

¶ 53 The next factor respondent addresses is factor 12, which is contributions and services by the party seeking maintenance to the education, training, career or career potential, or license of the other spouse. The circuit court reiterated its previous findings. Here, petitioner became a chiropractor before the parties' marriage. Respondent did testify she had to change jobs a few times to accommodate petitioner's employment. She also testified she assisted petitioner with getting the marital business ready and worked in the office when it first opened. Respondent did not testify as to how long she did such work. Respondent presented no evidence suggesting her contributions were like those of the spouse in the case which she cites. See *In re*

*Marriage of Rubinstein*, 145 Ill. App. 3d 31, 38, 495 N.E.2d 659, 664 (1986) (finding wife was entitled to permanent maintenance where she provided the parties' primary income for nine years while the husband completed his medical education). Given the circuit court found respondent's career was not impacted by petitioner's career and business, we do not find the court erred in concluding this factor did not weigh in favor of maintenance.

¶ 54 Additionally, the circuit court found petitioner had significant nonmarital educational debt. The court noted the marital estate contributed little to that debt while respondent's master's degree was paid in full by the marital estate. Respondent testified petitioner was intentionally not paying his student debt with the idea it will ultimately be forgiven. However, the circuit court was not required to accept respondent's self-serving testimony about petitioner's educational debt. No other evidence was presented the debt would be forgiven. Thus, we find the circuit court did not err by finding petitioner's extensive educational debt was a proper factor to consider in determining maintenance.

¶ 55 In this case, the equalization of the marital estate left both parties in debt. Neither party could maintain the marital standard of living in their separate households. Additionally, petitioner had significant nonmarital educational debt. While petitioner's income and future earning capacity was greater than respondent's, those are just two factors in determining maintenance. Given the other factors and circumstances, we find the circuit court did not abuse its discretion by denying respondent maintenance.

¶ 56                                    III. CONCLUSION

¶ 57            For the reasons stated, we affirm the McLean County circuit court's judgment.

¶ 58            Affirmed.